Jack D. DEWEY, Plaintiff,

v.

ALLSTATE INSURANCE COMPANY, Defendant.

Civ. A. No. 79–2265.

United States District Court, D. Kansas.

Nov. 6, 1981.

---

David P. Troup, Weary, Davis, Henry, Struebing & Troup, Junction City, Kan., for plaintiff.

Paul Hasty, Jr., Wallace, Saunders, Austin, Brown & Enochs, Overland Park, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This case raises novel questions of law under the Kansas Automobile Reparations Act [hereinafter No-Fault Act]. The issue is whether a person who is a partner in a business that is suffering a tax loss is entitled to disability benefits under personal injury protection [hereinafter PIP coverage] of his automobile accident insurance, and if such benefits are due, how they are to be measured. The case was tried to the Court on October 21 and 22, 1981. Pursuant to F.R.C.P. Rule 52, the Court makes the following findings of fact and conclusions of law.

### I

Plaintiff, Jack Dewey, is a young man, self-employed as a partner in the partnership of Chauncey Dewey & Sons, LV Ranch, Brewster, Kansas. Plaintiff's father, Chauncey Dewey, has been associated with the cattle-ranching business for more than fifty years. Plaintiff was insured under a standard automobile insurance policy with defendant Allstate Insurance Company [hereinafter Allstate] on December 11, 1977, when he was injured in a single car accident in Rawlins County, Kansas.

The father and son partnership was formed in 1973, and is actively engaged in the ranching of cattle and the management of grazing land. Some grain is raised, but the partners both testified that grain production was insubstantial in relation to the cattle raising business. When the partnership was formed, the father contributed capital in the form of land and cattle, while the son contributed his labor to the partnership. The evidence was uncontradicted that the father had performed little manual work on the ranch since 1967, when his kneecap was removed.

The partnership owns some 6,000 acres of land and maintains a herd of 368 head of cattle, not counting bulls and calves. From the start of the partnership, the bulk of day-to-day work was performed by plaintiff. Typically in the winter, plaintiff worked a 7 or 8-hour day, loading 100–200 bales of hay, feeding it to the cattle, and checking on their condition twice or more a day. Late winter and early spring brought the calving season, the busiest time of the year at the ranch. During calving season, the cattle were fed and the cows checked more or less constantly, because the time of birth and soon thereafter is the most precarious time for a new calf. Difficult births have to be handled promptly, calves must be constantly checked for signs of disease and distress, and quickly taken in under cover and warmed up when sick or threatened by adverse weather. A rancher

works intermittently around the clock during calving season. During calving season, the calves were checked from the back of a horse. Plaintiff's father could no longer ride because of his knee, so all the riding fell to plaintiff. During the late spring and summer, the bulk of work involved fencing and watching the cattle and maturing calves. Plaintiff worked 7 to 8 hours a day, mostly inspecting cattle and fence from a pick-up truck. The late fall was the lightest time around the ranch. The herds were checked, and the calves made ready for sale.

Plaintiff was injured in December, 1977, when he broke his right femur in a single car accident in Rawlins County, Kansas. As a result of his injury, plaintiff couldn't ride at all until June, 1978, and thereafter for only short periods of time. Apparently there is no serious dispute about plaintiff's injury and its consequences, because Allstate stipulated orally at trial that plaintiff was disabled for six months following his injury, and partially disabled for three months after that. Furthermore, the evidence was that for the full nine-month period following the accident, plaintiff performed little productive work around the ranch.

With plaintiff disabled, responsibility for work on the ranch fell to his father and stepmother. Plaintiff was disabled at a particularly bad time, because the calving season was commencing. Several neighbors, as well as plaintiff's uncle, came to help with work around the ranch during the calving season, and at other times during plaintiff's disability. There was considerable testimony on this point. Some of the people who worked on the ranch did so without compensation in the form of cash. In the past, it was the custom for the extended Dewey family, including Chauncey Dewey's brother, Otis, to work at the ranch, sometimes for pay, sometimes not. Similarly, other neighbors worked at the LV Ranch without pay, but plaintiff would at a later time perform some work at their ranch. Both plaintiff and his father agreed at the trial that there was never any agreement among them before or after plaintiff's injury that work on the LV Ranch would be traded for work on another ranch on an equivalent basis or any other basis. It simply was customary for neighbors and family to help each other from time to time on a trade-work basis. Further complicating matters is the fact that plaintiff's disability was not the sole motivating force in many of the decisions of neighbors to work at the LV Ranch during this period. The testimony was that some of these people would have come when they did and done the work they did even if plaintiff had not been disabled by his broken leg. Consequently, the Court is unable to conclude that the expenses incurred by the partnership for labor during this period can be solely attributed to plaintiff's disability. By having family and neighbors work on their ranch, the Deweys incurred little cash expenditure and, if anything, became only morally obligated to work for their neighbors and family when their time, work and inclination moved them to do so.

A few conclusions are inescapable, however. The calving season passed in 1978 without any person on the ranch available to constantly check on cows and calves. Furthermore, in 1978, the LV Ranch lost sixty-five to sixty-eight calves in a winter not remembered for its severity. Normal calf loss was usually around thirty-six calves per season. Both plaintiff and his father attributed the high mortality to the fact that the calves weren't being watched. The testimony was uncontradicted that if discovered early enough, a weak calf can be brought back to strength by being brought inside and warmed up. Thus, even though none of the calves were autopsied or otherwise examined to determine cause of death, at least some of the unusual number of deaths that season must be attributed to the lack of being watched.

The pretrial order shows the gross income of the LV Ranch partnership, of which plaintiff was a fifty percent partner, was as follows for the years indicated:

| 1974 | $33,432.16 |
| 1975 | $29,048.82 |
| 1976 | $34,333.87 |

| 1977 | $43,716.28 |
| 1978 | $91,018.23 |

In each year, however, the partnership showed a net loss for tax purposes. Gross income varied each year due to the number of calves, but more importantly due to differences in market price for calves each year. In the case of the LV Ranch, income depended upon more than the hard work of the ranchers.

Plaintiff and his father were fifty percent partners, and shared equally in all losses. At the time of his accident, plaintiff lived on the ranch, and most, if not all, of his living expenses were paid by the ranch. Both plaintiff and his father took a draw from the partnership. Plaintiff drew $200 each month, and his father drew $380 per month. Plaintiff drew the same amount during his disability because, as a partner, his draw did not depend on the work done by him during the month. At the trial, plaintiff's father said that in his opinion it would cost $1,500 per month to hire a man to do the work plaintiff did on the ranch, if someone could be found to do the work. By affidavit, dated August 6, 1979, plaintiff's father gave his opinion of how much it would have cost him to hire someone to do plaintiff's work in the winter and spring of 1978:

> "The cheapest that I think it would have been possible to hire this kind of help would be $650.00 per month. If you could even find anyone in this country to do it." (Plaintiff's Exhibit 18.)

Although admittedly that of an interested witness, plaintiff's father's opinion must be given weight in light of his fifty and more years in the cattle-ranching business.

Plaintiff first made a claim against his insurance policy on January 12, 1978. (Defendant's Exhibit D.) His application for benefits shows medical expenses of $4,556.71, which were paid in full. On this application, plaintiff indicated that he lost wages as a result of his accident, but he did not fill in the blank which asked him what his average weekly salary was at the time of his accident.

On January 24, 1978, plaintiff completed a notarized form provided by Allstate upon which he indicated a monthly salary of $2,861.16 in 1976 and $2,420.67 in 1975; or $34,333.87 and $29,048.04 per year, respectively. These figures, of course, correspond to the gross income of the LV Ranch partnership for those years. On this form, plaintiff indicated that his monthly income at the time of his injury was approximately the same as in 1975 and 1976. (Defendant's Exhibit E.)

By telephone conversation with Allstate's agent, Sally Huerter, from his bed in St. Anthony's Hospital on December 14, 1977, however, plaintiff informed Allstate that his monthly salary was $200 per month, plus money earned irregularly from working for his uncle. (Plaintiff's Exhibit 21.)

By February 9, 1978, plaintiff's attorney had become involved in the processing of his PIP claim against Allstate. On that date, Schedule F of IRS Form 1040 was mailed by plaintiff's lawyers to Allstate in order to substantiate the partnership's gross income for the years 1974, 1975 and 1976. In his letter of February 9, 1978, plaintiff's attorney expressed his opinion that Schedule F reflecting plaintiff's gross income was all that was needed to substantiate plaintiff's lost income for PIP purposes. (Plaintiff's Exhibit 5.)

Meanwhile, Allstate had set up a reserve of $8,500 in anticipation of paying plaintiff's lost wage claim. (Plaintiff's Exhibit 21, diary, p. 1.) Receipt of the Schedule F tax records was not deemed by the insurance adjuster to meet Allstate's requirements for proof of plaintiff's loss, because they were partnership records and did not reveal what plaintiff's actual gross income was. The evidence indicates that plaintiff's attorney was informed on February 16, 1978, that Allstate would not pay lost wages based on the Schedule F records provided, but would wait for proof of lost wages based on net income for 1976, or the cost of replacement help. (Plaintiff's Exhibit 21, diary, p. 1.)

Plaintiff's attorney responded on April 4, 1978, with a letter formally demanding pay-

ment, plus interest at eighteen percent (18%), and attorney's fees. He explained that neither the statute nor the policy would place as restrictive an interpretation on "monthly earnings" as Allstate was suggesting. (Plaintiff's Exhibit 6.)

Allstate responded by telephone on April 11, 1978, and discussed the proof of lost wages. Allstate assured plaintiff's counsel that they would not pay the eighteen percent penalty because plaintiff still had not provided them with the information they needed to process his claim. (Plaintiff's Exhibit 21, diary, p. 2.)

On May 4, 1978, plaintiff's counsel advised Allstate by letter that he was seeking opinions from the Attorney General and the Insurance Commissioner's Office on the matter. He advised Allstate that in his opinion non-salaried people often "earn" or derive economic benefit from labor in an amount considerably greater than the amount of their taxable income. If the legislature had meant "taxable income" to define "monthly earnings," it could have done so easily, and, in his opinion, Allstate's construction of the statute and policy was not based on good faith. (Plaintiff's Exhibit 7.) Allstate, however, remained unswayed by this letter, and continued to await adequate verification of loss before paying plaintiff's lost wage claim.

By letter on December 4, 1978, plaintiff's counsel once again asked Allstate to pay plaintiff's lost wages in the amount of $5,850, discounting interest and attorney fees. This figure was based on a period of disability extending nine months from injury at the statutory maximum of $650 per month. (Plaintiff's Exhibit 9.) This letter apparently elicited no response from Allstate.

By letter of March 22, 1978, plaintiff's counsel made reference to plaintiff's failure to provide Allstate with a copy of his individual tax return for 1977 and previous years. These returns were not provided because plaintiff's counsel felt that they would be of no help in showing the value of plaintiff's services to the partnership. The testimony at trial indicated that plaintiff's

tax return in 1977 showed an income of $2,400, the annual total of his monthly $200 draw. The wage and earnings portions of plaintiff's tax returns were not given to Allstate until October, 1980, following an order of the United States Magistrate.

By letter of March 29, 1979, Allstate informed plaintiff's counsel that plaintiff must prove his loss by substantiating the value of his services *and* showing the expenses the partnership was required to incur to have the services performed. (Plaintiff's Exhibit 11.) Mr. Schamberger, the author of that letter, in his capacity as Casualty Unit Manager, was reluctant to testify at the trial about what that letter indicated as to Allstate's requirements of plaintiff. Upon repeated questioning, he evaded making a statement of exactly what proof of loss Allstate would accept from a person in plaintiff's business and financial position. The letter, however, speaks for itself, and the Court finds that it states with sufficient clarity that Allstate would require plaintiff to both substantiate the value of his services *and* show proof of the expenses incurred by the partnership to have those services performed. The Court's finding is buttressed by the diary maintained by Allstate on plaintiff in which the adjuster referred to the letter of March 29, 1979, and wrote: "I will wait on attorney's response to *requirements* outlined in the letter." (Plaintiff's Exhibit 21, diary, p. 3, entry of 4–5–79.) (Emphasis added.)

Plaintiff's counsel immediately answered Allstate's letter. His response to Allstate took issue with the requirement that both a value be placed on plaintiff's services and that out-of-pocket expenditure for replacement help be proved. He argued that such an interpretation would penalize plaintiff simply because his father and uncle picked up the slack during the nine-month period of his disability without requiring cash payment. Plaintiff's counsel argued that plaintiff's services had a value which could be estimated by his father and other farmers and ranchers in the vicinity, and that the value of plaintiff's services was independent of the out-of-pocket expense incurred to replace him.

The insurance adjuster's diary entry of April 9, 1979, reveals that Allstate was unpersuaded by plaintiff's counsel's argument. That entry states in part:

"I suggest we stay with the interpretation that such additional help needed while [plaintiff] was disabled had to be incurred. . . ."

In a letter from Allstate's Casualty Unit Manager, Mr. Schamberger, to plaintiff's counsel on April 13, 1979, attention is called to the fact that plaintiff's "income" of $200 per month did not appear to Allstate to change during the period of his disability. Mr. Schamberger asked for a statement of plaintiff's monthly salary at that time and during the period of his disability. (Plaintiff's Exhibit 13.)

Plaintiff's counsel replied on April 18, 1979, that plaintiff was a partner in the LV Ranch, not a salaried employee, and that his monthly draw was not and could not be the sole factor in computing his lost earnings or value to the partnership. (Plaintiff's Exhibit 14.)

Allstate's position during this period can best be exemplified by the second paragraph of a letter from Mr. Schamberger to plaintiff's counsel, dated July 18, 1979, where he said:

"The dictionary defines 'loss' as being deprived of, or missing something. Mr. Dewey was paid his regular salary. He was 'deprived' of nothing. He also did not pay out any expenses that might constitute a 'loss.' Monetarily, he is in the same position that he would have been if the accident had never happened. It makes no difference if the injured person is a salaried individual, a farmer, or a professional gambler. He must substantiate that he suffered an actual 'loss' before he is entitled to compensation." (Plaintiff's Exhibit 17.)

On August 8, 1979, plaintiff's counsel sent Mr. Schamberger a demand letter for the benefits owed, plus interest, exclusive of attorney's fees, in the amount of $7,250. Enclosed with this letter was the affidavit of plaintiff's father, which stated:

(1) that the cheapest it would have been possible to hire help to replace plaintiff would have been $650 per month, if anyone could be found to do it;

(2) that Otis Dewey was paid $1,065 for part of the "many hours he put in" while plaintiff was disabled;

(3) a neighbor was paid $75;

(4) most of the labor was traded with neighbors and would have to be repaid when they needed extra help;

(5) that Beth Bolio was paid $86 and Karen Mays was paid $10 for household work done while plaintiff's father's wife, Deanna, was out helping with ranch work; and

(6) that plaintiff's disability caused 8–12 hours more work for them per day, and that plaintiff could have done that work had he been well.

(Plaintiff's Exhibit 18.)

An Allstate memo from Bill Stower to Roger Elston reveals that this affidavit was viewed as "a quantum of proof" of the value of plaintiff's services to the partnership, and as a basis for a possible tender of $1,236 based on allowance of all sums mentioned in the affidavit. Plaintiff's father's opinion as to the value of his son's services, $650 per month, was not addressed. (Plaintiff's Exhibit 21.) There is no indication that Allstate even made a tender based on the affidavit.

It thus appears neither plaintiff nor defendant cooperated to the fullest extent possible in resolving this matter. Plaintiff failed to supply Allstate with his tax returns until ordered to do so by the Court. Allstate failed clearly to inform plaintiff's counsel or plaintiff of its requirements for proof of lost earnings during the period of plaintiff's disability. Mr. Schamberger's letter of March 29, 1979, requesting proof of the value of plaintiff's services and proof of the expenses incurred in performing those services during plaintiff's absence was the only indication by Allstate of its requirements. Plaintiff's counsel responded in a reasonably timely manner with an affidavit from plaintiff's father concerning these matters, however, Allstate did not act on

this information either by tendering an offer or by rejecting the affidavit and giving their reasons for doing so. At no time following receipt of the affidavit did Allstate tell plaintiff what would satisfy their requirements, nor did they indicate to the insured the ways in which the affidavit failed to meet their requirements. Even at the trial, while testifying as a witness, Mr. Schamberger evaded answering these questions.

## II

The No-Fault Act was enacted in Kansas to "provide a means of compensating persons promptly for accidental bodily injury arising out of the ownership, operation, maintenance or use of motor vehicles in lieu of liability for damages" to the extent provided in the Act. K.S.A. 40–3102. The Act is implemented through three components: (1) all owners of motor vehicles are required to obtain insurance [K.S.A. 40–3104]; (2) PIP benefits are provided for economic losses; and (3) the tort threshold eliminates claims for minor non-injury losses.

PIP coverage encompasses a wide range of benefits, including medical expenses, disability benefits, rehabilitation benefits, survivors benefits, and funeral benefits. K.S.A. 40–3103(q). Disability benefits are paid to compensate an injured person for loss of "monthly earnings" due to an injured person's inability to engage in available and appropriate gainful activity up to a maximum of $650 per month for a period of twelve months. Plaintiff was totally disabled for six months following his accident, and partially disabled for three more months, during which period of time he was unable to do any productive work, and was thus disabled for purposes of the no-fault statute for a nine-month period. Assuming a nine-month disability, the question remains how to measure plaintiff's loss while he was disabled.

In the contract of insurance, Allstate agreed to pay plaintiff a sum to compensate him for his loss of monthly earnings due to inability to work, up to a maximum of $650 per month for one year. At the trial, All-state took the position that it was not liable to plaintiff because: (1) plaintiff had suffered no loss of monthly earnings, and (2) if plaintiff did lose monthly earnings, his loss was not adequately proved.

The PIP endorsement to plaintiff's policy of insurance defines "monthly earnings" to mean, "one twelfth of the annual earnings at the time the bodily injury was sustained, of an eligible injured person who is regularly employed or regularly self-employed...." "Monthly earnings" is defined by K.S.A. 40–3103(*l*) as:

"... In the case of a regularly employed person or a person regularly self-employed, one-twelfth ($\frac{1}{12}$) of the annual earnings at the time of injury; or (2) in the case of a person not regularly employed or self-employed, or of an unemployed person, one-twelfth ($\frac{1}{12}$) of the anticipated annual earnings from the time such person would reasonably have been expected to be regularly employed...."

The Court concludes that plaintiff was a person regularly self-employed as defined by the Act and the policy of insurance.

It is, of course, difficult to qualify the loss of monthly earnings of a self-employed person. Ranchers, attorneys, insurance agents and other self-employed people often do not make a regular monthly wage, and many of them have no salary at all. However, the lack of a monthly wage does not mean that self-employed people are not entitled to disability benefits. Instead, insurers should determine what the disabled person actually lost.

One measurement of what a disabled person actually lost by reason of his injury is his economic loss; that is, the out-of-pocket expenses incurred by the self-employed person to pay someone else to perform the services he would have performed had he not been injured. Annot., 37 A.L.R.2d 353, 365, and Later Case Service. In this case, however, there were minimal out-of-pocket expenses because the people who performed the work plaintiff would have performed but for his injury did not

insist on and did not receive payment for their labor. The fact that there was little, if any, out-of-pocket expenses incurred to replace plaintiff's labor does not mean that he is not entitled to disability benefits, however. In *Hand v. State Farm Mutual Automobile Insurance Co.*, 2 Kan.App.2d 253, 577 P.2d 1202, *rev. denied* 225 Kan. 844 (1978), a mother and infant son made a claim against the defendant insurance company for PIP survivor's benefits following the death of the husband in an automobile wreck. At the time of the husband's death, a divorce was pending and the wife and child were receiving no financial support from the decedent. The Court of Appeals held that the survivors did not need to prove any actual economic or out-of-pocket loss in order to be entitled to survivor's benefits. The Court held that the " 'loss of an injured person's monthly earnings after his or her death' refers to the loss of *earning power* occasioned by the death of the insured and is not measured by the actual loss of the survivors." *Id.* at 257, 577 P.2d 1202. (Emphasis added.) In that case, the Court stated: "If the legislature had intended survivor's benefits be limited to the economic loss suffered by the survivors, we believe it would have so stated or a formula would have been provided for computation of survivors' benefits in terms of something other than the statutorily defined 'monthly earnings.' " *Id.* at 257–58, 577 P.2d 1202.

■ In that case, as in this one, we are of the opinion that had the legislature intended to limit the disability benefits of self-employed persons to the actual out-of-pocket expenses they incurred to have their work done for them, the legislature would have so stated. Of course, if out-of-pocket expenses have been incurred, they may be used by an insurer to determine the amount of disability benefits a self-employed person may be entitled to; however, the lack of out-of-pocket expenses does not mean that the insured is entitled to nothing at all.

■ In a similar vein, an insurer may make reference to the net income of the self-employed person's business in order to determine the amount of disability benefits

the injured person is entitled to receive. A self-employed person with a business that is suffering a tax loss, however, is not for that reason alone completely precluded from receiving disability benefits. In *Bradley v. AID Insurance Company*, 6 Kan.App.2d 367, 629 P.2d 720, *rev. denied* 230 Kan. VI (1981), a widow sued an insurance company for survivor's benefits. Her husband was self-employed in a used car business until his death in an automobile wreck. The insurance company took the position that her husband had no monthly earnings from the used car business because the business showed a loss for tax purposes during the year it was in existence. The Court of Appeals held that the terms "profits" and "earnings" were not synonymous, and that profits should be the measure of earnings for PIP purposes only where the business does not involve substantial investment capital and depends only on the personal endeavors of the insured. *Id.* at 373–74, 629 P.2d 720.

■ It is certain that the cattle-ranching business conducted by Chauncey Dewey & Sons at the LV Ranch involved a substantial capital investment. The testimony was uncontradicted that the partnership owned some 6,000 acres of land and a substantial herd of cattle, as well as buildings and machinery necessary to the functioning of a cattle-ranching business. Furthermore, the testimony was clear that a profit or a loss for a given year was almost completely independent of the personal labors of the partners; market price and weather determined the profit or loss each year at the LV Ranch. Therefore, although profit or loss could be taken into account by the insurer in determining the disability benefit due plaintiff, Allstate could not deny a disability benefit solely because the ranch operated at a loss for tax purposes each year. [*See Chicago R.I. & P.R. Co. v. Posten*, 59 Kan. 449, 53 P.2d 465 (1898)].

In its 1981 *Evaluation Of The Kansas No-Fault Law*, the office of the Kansas Commissioner of Insurance addresses the problem of determining the loss of monthly earnings for someone self-employed. In that report, the position is taken that:

"In determining the loss of monthly earnings for someone self-employed, insurers must look at what the person actually lost. The key to making this determination is to look at the value of the service performed in relation to the business. This is necessary because the value of the services are worth something and, therefore, are compensable. It appears possible for the business of a self-employed person to actually suffer a loss for the year, and yet have the individual be entitled to benefits. *To calculate what was lost, insurers can determine what it would cost to hire someone to do the work the injured person performed.*" *Id.* at 37–38.

[See also, Note, *No Fault Automobile Insurance, An Analysis of the Kansas Automobile Injury Reparations Act,* 20 Washburn L.J. 375, 390–91 (1981).]

■■■ This position appears to the Court to be well taken, especially in a case like the present one. Plaintiff's monthly earnings were a complex sum of the value of his personal endeavors and return on invested capital, less expense, many of which would be expected to occur regardless of his ability to work. By his inability to work, plaintiff lost the value of his own services. If these services had been performed for pay by another person, Allstate would have little difficulty in measuring their value directly. The fact is that these services were performed by other persons for little or no pay, or were not performed at all during plaintiff's disability. This does not mean that these services had no value. Quite the contrary is true. These services had value, and an estimate of their value was provided Allstate in the form of an affidavit from plaintiff's father, dated August 6, 1979, estimating their value at $650 per month—an estimation the Court finds to be an accurate and reasonable one. The Court finds plaintiff's father to be a credible witness whose opinion deserves controlling significance in light of his more than fifty years in the cattle-ranching business, and the fact that his opinion is not rebutted in the evidence before us. Questions of plaintiff's father's interest in the lawsuit are directed to the weight of his opinion, not to its admissibility.

■■■ An insured whose disability benefits are overdue is entitled to those benefits, plus interest. K.S.A. 40–3110 states:

"(b) Personal injury protection benefits payable under this act shall be overdue if not paid within thirty (30) days after the insurer or self-insurer is furnished written notice of the fact of a covered loss and of the amount of same ... *Provided,* That no such payment shall be deemed overdue where the insurer or self-insurer has reasonable proof to establish that it is not responsible for the payment, notwithstanding that written notice has been furnished. ... All overdue payments shall bear simple interest at the rate of eighteen percent (18%) per annum."

The eighteen percent (18%) interest rate has remained unchanged since the statute was enacted in 1973. Session Laws of Kansas, Ch. 198, § 10(b) (1973). The PIP endorsement to the insurance policy contains a similar provision, which differs from the statute in only an insignificant manner. (Plaintiff's Exhibit 1, § 1, Clause F.)

■■■ One of the main purposes of the Kansas No-Fault Act was to provide prompt payment of PIP benefits to an injured insured without regard to fault upon notice to the insurance company and proof of loss. *Easom v. Farmers Insurance Co.,* 221 Kan. 415, 429, 560 P.2d 117 (1977). In the instant case, Allstate was notified of plaintiff's injury within forty-eight hours, as is evidenced by a transcript of a telephone conversation an adjuster had with plaintiff in his hospital room three days after the accident. (Plaintiff's Exhibit 21.) The amount of the loss was furnished Allstate in the form of an affidavit by plaintiff's father, dated August 6, 1979. This affidavit was received by at least August 22, 1979, as reference is made to it in a letter from Bill Stower, Allstate Casualty Claim Director, to Roger Elston, Allstate Casualty Claim Analyst, on that date. Therefore, thirty days after August 22, 1979, on September 21, 1979, plaintiff's

claim for disability benefits became overdue, and interest at the rate of eighteen percent (18%) per annum will be assessed from that date. Had Allstate felt this affidavit was deficient in some respect, it should have so notified plaintiff, or conducted its own investigation. *Cf. Matthews v. Travelers Insurance Co.*, 212 Kan. 292, 299, 510 P.2d 1315 (1973) [disability insurer not required to pay a claim without litigation where a *bona fide* question of liability exists, but the company is under an obligation to conduct a good-faith investigation into the facts before it finally denies liability and refuses payment].

In addition to the foregoing, the Court makes these further conclusions of law:

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1332, and venue is proper in this district.

2. At the time of his injuries in December, 1977, plaintiff was regularly self-employed as that term is used in K.S.A. 40–3103.

3. The type of business plaintiff is engaged in does not depend only on the personal endeavors of the owner of the business for its success. Because many other items affect the profitability of his business, the profits of the business are not an appropriate measure of monthly earnings for purposes of PIP benefits.

4. Despite the fact the LV Ranch had a net taxable loss for the three years immediately prior to his injuries, plaintiff still had monthly earnings as defined by K.S.A. 40–3103(*l*).

5. Plaintiff has established an earnings loss equal to the maximum amount of disability benefits to which he would have been entitled for the nine-month period of his disability, and is accordingly entitled to the sum of $650 per month for nine months, or a total of $5,850.

6. The refusal of plaintiff's counsel to provide complete tax returns to Allstate did not constitute a breach of the policy.

7. The fact that plaintiff's loss exceeded the maximum allowable under the policy was made known to Allstate with sufficient clarity by August 22, 1979. Accordingly, the Court concludes that benefits were overdue as of September 21, 1979, and interest should be allowed at the rate of eighteen percent (18%) per annum from that date.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered for plaintiff in the amount of Five Thousand Eight Hundred Fifty and 00/100 Dollars ($5,850.00), with interest at the rate of eighteen percent (18%) per annum from September 21, 1979.